Freeman BRANHAM, Plaintiff,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.

Civ. A. No. 3:92–0667.

United States District Court,
S.D. West Virginia,
at Huntington.

Aug. 27, 1993.

Kenneth P. Hicks, Thomas M. Plymale, Huntington, WV, Thomas C. Wood, Jr., Greiser, Schafer, Blumenstiel & Slane, Columbus, OH, for plaintiff.

Fred Adkins, Sharon E. Rowsey, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, WV, for defendant.

**MEMORANDUM ORDER**

TAYLOR, United States Magistrate Judge.

In the context of organizations represented by counsel, commentary appended to Rule 4.2 of West Virginia's Rules of Professional

Conduct[1] prohibits communication by counsel "for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization."[2] Armed with this Rule,[3] the Comment accompanying it, and Rule 801(d)(2), Fed.R.Ev., defendant comes before the Court on Motion for a Protective Order asking that plaintiff's counsel, or his representatives, be prohibited "from contacting and/or interviewing employees of Defendant, *ex parte.*"[4] Defendant also requests that plaintiff's counsel be required to disclose "any other *ex parte* contact that has taken place in this matter and to bar the use of any previous information obtained by counsel in such a manner."

At the hearing on the motion, scant attention was given the facts underlying plaintiff's claim[5] or the circumstances involved in prior *ex parte* contacts. Presumably, this was a consequence of the fact that, in defendant's view, a corporate employee, though "just a fact witness," is included within the group of individuals characterized as a "party" under Rule 4.2 and its accompanying Comment, without regard to the employee's status, his involvement in the incidents giving rise to a claim or whether he is a CEO or an hourly laborer.

■ As an initial matter, the Court takes note of the fact that the literature concerning *ex parte* interviews of corporate employees is substantial, and it is to be doubted whether further insights with respect to this obviously significant and seemingly complex issue will emerge. Certainly this Court, having reviewed numerous law review articles and innumerable decisions from state and federal courts, has no original thoughts on the matter. Suffice it to say that various "tests" or standards have evolved, that each has adherents and that all, seemingly, have been the subject of thoughtful criticism. Solutions ad-

---

1. As Judge Copenhaver so aptly observed, these rules, and their counterparts in other jurisdictions, are "the product of experience gained over the decades, even the centuries, and are designed to establish and assure standards of simple fairness and moral and ethical responsibility on the part of counsel in furtherance of the ends of justice." *In re FMC Corporation*, 430 F.Supp. 1108, 1110 (S.D.W.Va.1977).

2. In contrast to the Comment, Rule 4.2, in relatively simple and straightforward terms, provides:

   In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

3. Rule IV(B), Model Federal Rules of Disciplinary Enforcement for the District Court for the Southern District of West Virginia provides standards of conduct for attorneys practicing in this Court. In relevant part, the Rule states:

   Acts or omissions by an attorney admitted to practice before this Court ... which violate the Code of Professional Responsibility or Rules of Professional Conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship. The Code of Professional Responsibility or Rules of Professional Conduct adopted by this Court is the Code of Professional Responsibility or Rules of Professional Conduct adopted by the highest court of the state in which this Court sits, as amended from time to time by that state court....

4. Plaintiff's counsel, or his representative, apparently interviewed one B.L. Short, a fellow employee, and made contact with Richard Keene, an employee occupying a management position.

5. It appears that plaintiff's claim, insofar as it relates to a July 21, 1989, injury, is premised on allegations of inadequate ballast or gravel between railroad ties. In the complaint, he states that, while in the employ of defendant, he was uncoupling cars and as he "uncoupled one car from the other ... he tripped over some railroad ties" resulting in "injuries, consequences and damages...." With regard to injuries alleged to have occurred on November 18, 1991, plaintiff alleges that, as he dismounted from a railroad car, he "experienced a sharp muscle spasm in the right side of his back." Whether B.L. Short, an employee of defendant "working with the plaintiff at the time of ... his alleged injuries," had anything to do with the conditions allegedly resulting in injuries was not established at the hearing, defendant asserting only that, as a consequence of Short's status as an employee of the railroad at the time an interview was conducted by counsel for plaintiff, *ex parte* contact contravened the provisions of Rule 4.2. The interviews were conducted following the filing of the complaint.

vocated include proposals to amend the Federal Rules of Evidence [6] and the Federal Rules of Civil Procedure.[7] In resolving the present dispute, it need only be noted that the Court's principal task involves interpretation of Rule 4.2, Rules of Professional Conduct,[8] and that, while decision is ultimately a matter of federal law,[9] in the absence of compelling reasons requiring otherwise,[10] the Court feels obliged, in matters involving ethical conduct, to adhere to the views of the Supreme Court of Appeals of West Virginia, "toward the end of creating a single, unified approach to attorney ethics within the ... [state], whether one practices in state or federal court." *Siguel v. Trustees of Tufts College, supra,* 1990 WL 29199, at *6, 1990 U.S.Dist. Lexis 2775 at *18.[11]

Controlling precedent for practitioners in the state courts is found in *Dent v. Kaufman,* 185 W.Va. 171, 406 S.E.2d 68 (1991). In *Dent,* Justice Neely, writing for a unanimous Court, concluded that the "best approach" to evaluating the propriety of *ex parte* contacts with corporate employees was that taken by the New York Court of Appeals in *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990).[12] Under the test adopted in *Niesig*—characterized in the spectrum of such "tests" as a "variation of the managing-speaking-agent test,"[13] Sinaiko, *supra* n. 3 at 1487 n. 180—*ex parte* contact falls within the prohibition of Rule 4.2 if it is with upper-level management, an employee whose negligence, imputed to the corporation under the doctrine of *respondeat superior,* gave rise to the action and employees implementing the advice of counsel.[14] More specifically, the Court stated:

The test that best balances the competing interests, and incorporates the most desirable elements of the other approaches, is one that defines 'party' to include corporate employees whose acts or constitute a reasonable accommodation of opposing, legitimate interests. The means of informal discovery are, for the most part, preserved, as is the integrity of the attorney-client relationship. Thus, there are no compelling reasons to depart from the Court's interpretation of Rule 4.2.

**6.** Stephen M. Sinaiko, Note, *Ex Parte Communication and the Corporate Adversary: a New Approach,* 66 N.Y.U.L.Rev. 1456 (1991).

**7.** John E. Iole and John D. Goetz, *Ethics or Procedure? A Discovery–Based Approach to Ex Parte Contacts with Former Employees of a Corporate Adversary,* 68 Notre Dame L.Rev. 81 (1992).

**8.** The focus is not, as counsel for defendant seems to assume, on Rule 801 of the Federal Rules of Evidence. This is perhaps most clearly demonstrated by the situation existing in Massachusetts. The Committee on Professional Ethics of the Massachusetts Bar Association, anticipating adoption of Rule 801 by the Massachusetts Supreme Judicial Court, interpreted its disciplinary Rule 7–104(A)(1), a rule substantially identical to Rule 4.2, as prohibiting a lawyer from interviewing employees of a corporate party concerning matters within the scope of the agency or employment without first obtaining consent of opposing counsel. Formal Op. No. 82–7, 67 Mass.L.Rev. 208 (Winter 1982). Though "reported decisions uniformly appear to undercut" the Association's view, *Siguel v. Trustees of Tufts College,* 1990 WL 29199, at *5–6, 1990 U.S.Dist. Lexis 2775 at *19 (D.Mass. March 12, 1990), the formal opinion had not been withdrawn at the time of the Court's decision in *Tufts.*

**9.** *See, McCallum v. CSX Transportation, Inc.,* 149 F.R.D. 104 (M.D.N.Car.1993).

**10.** In fact, the Court is convinced that the standards adopted by the West Virginia Supreme Court, and its interpretation of Rule 4.2, are supported by clear and cogent authority and

**11.** *See also, Polycast Technology Corporation v. Uniroyal, Inc.,* 129 F.R.D. 621, 624–25 (S.D.N.Y. 1990).

**12.** Adoption of the *"Niesig* test" by the Supreme Court of Appeals of West Virginia illustrates, again, the relative importance, in this dispute, of Rule 4.2 vis-a-vis Rule 801. While Rule 801 of the West Virginia Rules of Evidence mirrors its federal counterpart, the federal rule and the West Virginia rule are "different from the New York State rule...." *Niesig v. Team I, supra,* 559 N.Y.S.2d at 498, 558 N.E.2d at 1035.

**13.** *See, Wright v. Group Health Hospital,* 103 Wash.2d 192, 691 P.2d 564 (1984). The "variation," of significance for purposes of this case, arises from the fact that, while the Court in *Wright* found "no reason to distinguish between employees who in fact witnessed an event and those whose act or omission caused the event leading to the action," *Id.* 691 P.2d at 569, the anticontact rule in *Niesig* extends to employees whose acts or omissions "caused the event leading to the action."

**14.** Protection is given employees implementing counsel's advice in order to preserve the attorney-client privilege.

**70**

omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's 'alter egos') or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel. All other employees may be interviewed informally.

Unlike a blanket ban or a 'control group' test, this solution is specifically targeted at the problem addressed by DR 7–104(A)(1).[15] The potential unfair advantage of extracting concessions and admissions from those who will bind the corporation is negated when employees with 'speaking authority' for the corporation, and employees who are so closely identified with the interests of the corporate party as to be indistinguishable from it, are deemed 'parties' for purposes of DR 7–104(A)(1). Concern for protection of the attorney-client privilege prompts us also to include in the definition of 'party' the corporate employees responsible for actually effectuating the advice of counsel in the matter....

In practical application, the test we adopt thus would prohibit direct communication by adversary counsel 'with those officials, but only those, who have the legal power to bind the corporation in the matter or who are responsible for implementing the advice of the corporation's lawyer, or any member of the organization whose own interests are directly at stake in a representation'.... This test would permit direct access to all other employees, and specifically—as in the present case—it would clearly permit direct access to employees who were merely witnesses to an event for which the corporate employer is sued.

559 N.Y.S.2d at 498–99, 558 N.E.2d at 1035–36. Emphasizing that it was a disciplinary rule, not a statute, which was at issue and pointing out that the distinction was "particularly significant" when a rule governing professional conduct was invoked in litigation

and, as a consequence, affected interest of nonlawyers, the Court felt that it was "not constrained to read the rules literally or effectuate the intent of the drafters,"[16] but could "look to the rules as guidelines to be applied with due regard for the broad range of interests at stake." *Id.* 559 N.Y.S.2d at 495, 558 N.E.2d at 1032. Speaking more bluntly, and with specific reference to the comment appended to Rule 4.2, the Court in *Dent* felt it "worth noting that the comment to the Rule is not part of the Rule and cannot be considered 'binding'...." Rather than attempt to construe a "foggy" and "ambiguously worded Comment," the Court chose to adopt the *Niesig* test. *Dent v. Kaufman, supra* 406 S.E.2d at 71–72. For similar reasons, and following state precedent on a matter governing ethical conduct, this Court need not attempt synthesis of the Comment's ban on *ex parte* contact with an employee "whose statement may constitute an admission on the part of the organization" and Rule 801(d)(2)(D)'s exclusion from hearsay of statements by a "party's agent or servant concerning a matter within the scope of the agency or employment." The fact that an employee's statement may be an admission under the provisions of this Rule, standing alone, simply provides no basis for barring *ex parte* contact.

■ There remains the question whether in this action, filed under the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.*, the provisions of § 60, 45 U.S.C. § 60, require a different result. In broad and, seemingly, all-encompassing language, that section provides that "[a]ny contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void...." It has been argued, successfully in at least two jurisdictions,[17] that the authorization "by

---

**15.** Courts considering the question have uniformly concluded that DR 7–104(A)(1) and Rule 4.2 are "functionally identical."

**16.** In defining "party" the Court specifically disclaimed any reliance on "the Official Comments

to ABA Model rule 4.2...." *Id.* 559 N.Y.S.2d at 499, 558 N.E.2d at 1036 n. 6.

**17.** *See, Lake v. Orgulf Transport Co.,* 1993 WL 194096 (W.D.Tenn.1993), applying 45 U.S.C. § 60 in a Jones Act case, and, *Norfolk Southern*

law" contemplated in Rule 4.2 is supplied by the statute. Technically, of course, the statute is a prohibition rather than an authorization, and, on initial reading, one is left wondering whether Rule 4.2's restriction on contact can withstand its sweeping language. It seems apparent, however, that § 60 has reference to conduct on the part of the railroad-employer[18] which inhibits the furnishing of information by an employee, not to ethical rules regulating the conduct of an "officer of the legal system." The Court, accordingly, finds no basis for departing from the *Niesig* test in this FELA action.[19]

With regard to the *ex parte* contact at issue, nothing presented indicates that conduct on the part of B. L. Short is causally connected to the injuries set forth in the complaint. It being defendant's burden to establish that an employee falls within a protected group, the motion will be denied insofar as it relates to the *ex parte* contact with this witness. While there appears to be no dispute with regard to the status of Richard Keene, it being conceded by counsel for plaintiff that, at his level in the organization, he has "'speaking authority' for the corporation,"[20] it does not appear that contact with him resulted in the provision of any information. If such exists, however, plaintiff shall turn over to defendant notes concerning any contact with Mr. Keene. The Court understands from representations of counsel for plaintiff that there was no other *ex parte* contact of employees of defendant.

Subsequent *ex parte* contact with employees of a party will, of course, be in conformity with the ruling set forth herein, subject to

the further admonition that, in addition to the provisions of Rule 4.2, Rule 4.3 has been construed to require that "the lawyer must make clear to the unrepresented employee the lawyer's role in the case, including the nature of the case, the identity of the lawyer's client, and the fact that the person's former or current employer is an adverse party." *Brown v. St. Joseph County,* 148 F.R.D. 246, 254 (N.D.Ind.1993).

The Clerk is directed to mail a copy of this Memorandum Order to all counsel of record.

---

*Railway Company v. Thompson,* 208 Ga.App. 240, 430 S.E.2d 371 (1993); *see,* however, *Garrett v. National Railroad Corp.,* 1990 WL 122911 1990 U.S.Dist. Lexis 10868 (E.D.Pa. August 14, 1990).

**18.** Citing legislative history, the Court in *Sheet Metal Workers International Association v. Burlington Northern Railroad Company,* 736 F.2d 1250, 1252 (8th Cir.1984), points out that "§ 60 was designed to prohibit the enforcement of company rules inhibiting the free flow of accident information...." In *Hendley v. Central of Georgia Railroad Co.,* 609 F.2d 1146, 1150 (5th Cir.1980), inclusion of § 60 in the Act is attributed to a recognition by its authors of "the danger that railroad agents would coerce or intimi-

date employees to prevent them from testifying...."

**19.** The Court need not conjure up a "worst case scenario" to demonstrate the serious implications of a contrary ruling. The logic involved in concluding that § 60 overrides Rule 4.2 would, for example, be equally applicable to *ex parte* contact with an in-house expert conducting an investigation in anticipation of litigation, but not expected to testify at trial, and would presumably override the provisions of Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure.

