Gants, J.
On March 18, 1999, one of the attorneys for plaintiff Roberta Edwards interviewed Cynthia Gallo — an employee of the defendant Massachusetts Bay Transportation Authority (“MBTA”) and a former subordinate of Ms. Edwards — without the knowledge or consent of the MBTA’s attorney. The MBTA claims that this interview violated Rule 4.2 of the Massachusetts Rules of Professional Conduct and asks this Court to impose severe sanctions for this alleged violation. For the reasons detailed below, the MBTA’s motion for sanctions is DENIED.
BACKGROUND
Beginning in 1993, Ms. Gallo served as the Assistant Director for Medical Operations at the MBTA. After Ms. Edwards joined the MBTA as its Chief Administrative Officer in October 1996, Ms. Gallo reported to Ms. Edwards. Ms. Gallo continued to report to Ms. Edwards at least until October 1997, when Ms. Gallo became the Director of Safety at the MBTA.
On January 8, 1997, Ms. Edwards wrote defendant Phil Puccia, an MBTA manager, and recommended that Ms. Gallo be promoted to Director of Medical Operations. As this promotion was being considered, allegations were made regarding Ms. Gallo’s work performance which resulted in the MBTA initiating an internal investigation. On March 27, 1997, after the MBTA had given Ms. Gallo four document requests and 86 interrogatories to respond to as part of the internal investigation, Ms. Gallo retained the Law Office of Kevin Powers to represent her in the internal investigation. The scope of this legal representation soon expanded. On June 27, 1997, Ms. Gallo filed a 28-page complaint with the Massachusetts Commission Against Discrimination (“MCAD”) alleging that she suffered discrimination because of her race and gender, and retaliation because of her advocacy of pay equality for women and minorities. In September -1997, Ms. Gallo, through Attorney Powers, settled her complaint with the MBTA.
Although Ms. Gallo’s complaint against the MBTA had been resolved and Ms. Gallo had been promoted in October 1997 to Director of Safety, repercussions from that complaint continued to be felt at the MBTA. On November 18, 1997, Ms. Edwards filed a complaint with the MCAD alleging that she had been discriminated against on the basis of her race and gender, and that she had been the victim of retaliation because of her advocacy at the MBTA against discrimination and retaliation. On November 21, 1997, the MBTA placed Ms. Edwards on administrative leave; on December 12, 1997, the MBTA fired her.
In the wake of the controversy that surrounded Ms. Edwards’ termination, the MBTA retained the law firm of Ropes & Gray to conduct an internal investigation into Ms. Edwards’ allegations.[1] The Ropes & Gray investigator, Peter Ebb, wished to interview Ms. Gallo, and Ms. Gallo asked Attorney Powers’ law office to represent her for the interview. That interview took place on May 18, 1998 at Attorney Powers’ law office, with Attorney Robert Mantell representing Ms. Gallo. On August 4, 1998, pursuant to Mr. Mantell’s request, Mr. Ebb sent Mr. Mantell a summary of his notes of the interview, identifying what Mr. Ebb characterized as the “key points.” On August 5, 1998, Mr. Ebb sent Mr. Mantell a second letter, informing him that Ropes & Gray had also been retained by the MBTA to conduct an investigation into Ms. Gallo’s MCAD complaint and asking for Mr. Mantell’s assistance in arranging an interview with his client and in forwarding all relevant documents.
Mr. Mantell responded to these two letters on August 17, 1998. He identified a number of alleged errors and omissions in Mr. Ebb’s summary and included a signed statement from Ms. Gallo also addressing some alleged errors and omissions. Mr. Mantell also complained to Mr. Ebb about the delay in providing this summary and other purported shortcomings of his investigation. In addition, Mr. Mantell requested a copy of any written findings, conclusions, and inves *396 tigative reports generated from Mr. Ebb’s investigation of Ms. Edwards’ allegations. Finally, Mr. Mantell wrote that Ms. Gallo’s March 27, 1997 MCAD complaint had been withdrawn, that Ms. Gallo had earlier cooperated in an internal investigation conducted by Attorney Jack Wofford, and that, for these reasons, Ms. Gallo did not wish to meet with Mr. Ebb again and did not wish to participate in his belated internal investigation.
On January 29, 1999, Ms. Edwards brought suit in this court alleging race and gender employment discrimination and retaliation by the MBTA and Philip Puccia. In her complaint, Ms. Edwards alleged that she had been supportive of Ms. Gallo when Ms. Gallo filed her MCAD complaint, and opposed the retaliatory actions allegedly taken against Ms. Gallo by the MBTA. Ms. Edwards alleged that the MBTA and Mr. Puccia discriminated against her on the basis of her race and gender, and retaliated against her because of her defense of Ms. Gallo.
Ms. Edwards had initially retained Attorney Powers to represent her in her litigation against the MBTA, but by the time she filed suit in this court she had changed counsel and was represented by the law firm of Zalkind, Rodriguez, Lunt & Duncan. In or around early March 1999, Inga Bernstein, an attorney with that firm, telephoned Ms. Gallo and asked if she would speak with her. Ms. Gallo agreed, and on March 18, 1999 she met with Ms. Bernstein and discussed the facts of her case for roughly an hour. Ms. Bernstein did not notify the MBTA of her request to interview Ms. Gallo or of the actual interview; nor did she seek the MBTA’s consent for the interview. Nor did she notify Mr. Powers or Mr. Mantell of her desire to speak with Ms. Gallo or seek their consent. Ms. Gallo did not even consider the possibility of having an MBTA attorney present with her for this interview, but she did consider whether she wanted Mr. Powers or Mr. Mantell to be there and decided that it was not necessary. Although Mr. Powers did not know of this interview before it occurred, he has consented to this interview after the fact.
On December 7, 1999, Ms. Gallo appeared pursuant to a subpoena duces tecum for a deposition held at the law offices of Zalkind, Rodriguez, Lunt & Duncan. According to Ms. Gallo’s deposition testimony, Mr. Mantell telephoned her prior to December 7, 1999 to obtain her authorization for the release of certain documents that had been subpoenaed for that deposition, and recommended to her that she have her own attorney present for the deposition. She chose not to have him or Mr. Powers attend, testifying that “I’m tired of paying attorneys, so I’m not paying them anymore.” On the morning of December 7, 1999, prior to the deposition later that day, Ms. Gallo met with Attorney Henry Moniz of the law firm of Bingham Dana LLP, which represented the MBTA during the lawsuit. The record is silent as to whether Mr. Moniz sought the consent of either Mr. Powers or Mr. Mantell before speaking with Ms. Gallo but it certainly appears that he did not. After discussing the matter with Ms. Gallo, Mr. Moniz represented her at the deposition in her capacity as an employee of the MBTA. However, during the course of that deposition, as a result of certain testimony provided by Ms. Gallo that was adverse to the MBTA, Mr. Moniz asked to speak privately with Ms. Gallo. After this discussion, Mr. Moniz declared on the record:
[W]e are of the opinion that we’ve reached that point where there may be the perception that there’s a conflict between the interests of my client, the T, and Ms. Gallo’s position. Given that, at this point, we would ask that the deposition be suspended, and we may, in fact, have to withdraw from representing Ms. Gallo in her capacity as an employee of theT.
Gallo 12/7/99 Depo. at 167. When the deposition resumed on June 30, 2000, Ms. Gallo appeared without an attorney representing her. It was during Ms. Gallo’s cross-examination by Mr. Puccia’s attorney on this day that Ms. Gallo disclosed her earlier interview with Ms. Bernstein, which triggered this motion.
DISCUSSION
This motion raises important issues about the interpretation of Rule 4.2 of the Massachusetts Rules of Professional Conduct, governing ex parte communications with a represented person.[2] Rule 4.2 provides in its entirety:
In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
Massachusetts Rule of Professional Conduct 4.2. Comment 4 to Rule 4.2 explains how this rule should be applied to officers and employees of an organization:
In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having managerial responsibility on behalf of the organization with regard to the subject of the representation, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the mattér by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).
Comment 4, Massachusetts Rule of Professional Conduct 4.2.
*397 The MBTA contends that, since Ms. Gallo was (and is) an employee and manager of the MBTA, Comment 4 prohibited Ms. Bernstein from having any ex parte communication with Ms. Gallo on March 19, 1999 without the consent of the MBTA’s counsel. Ms. Bernstein contends that this was not a prohibited ex parte communication under Rule 4.2 and Comment 4 because (1) Ms. Gallo, although a manager at the MBTA, did not have “managerial responsibility on behalf of the organization with regard to the subject of the representation'' (emphasis added), (2) that her act or omission in connection -with this matter may not be imputed to the MBTA for purposes of civil or criminal liability, and (3) her statements could not have constituted an admission on the part of the MBTA. In the alternative, Ms. Bernstein argues that, even if her interview of Ms. Gallo was an ex parte communication under Rule 4.2 and Comment 4, the Rule was not violated because Ms. Gallo’s counsel consented to the interview, albeit after the fact. The MBTA replies to this last assertion that Mr. Powers was not Ms. Gallo’s counsel “in the matter,” so his consentís not sufficient. The MBTA further replies that, even if Mr. Powers’ prior consent would have been sufficient, his subsequent consent cannot. As discussed below, this Court decides this motion solely on Ms. Bernstein’s alternative ground, and does not reach the issue of whether her interview of Ms. Gallo was a prohibited ex parte communication.
In interpreting Rule 4.2 and Comment 4, it is important first to look to the Preamble and Scope of the Massachusetts Rules of Professional Conduct to determine how the Supreme Judicial Court wished its rules to be interpreted. The very first paragraph of the section entitled “Scope" provides, “The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself.” Scope 1, Massachusetts Rules of Professional Conduct. The last paragraph of the Scope section declares, “The Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule. The Preamble and this note scope provide general orientation. The Comments are intended as guides to interpretation, but the text of each Rule is authoritative.” Scope 9, Massachusetts Rules of Professional Conduct.
In examining the “authoritative” text of Rule 4.2, it is important to recall that Rule 9.1(h), which sets forth definitions applicable to the Massachusetts Rules of Professional Conduct, defines “person” to include “a corporation, an association, a trust, a partnership, and any other organization or legal entity.” Massachusetts Rule of Professional Conduct 9.1(h). Therefore, when Rule 4.2 prohibits a lawyer from communicating “about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter” (emphasis added), that person may be either a human being or a legal entity, such as a corporation or government organization.
There can be no dispute that, as of March 18, 1999, when Attorney Bernstein interviewed Ms. Gallo, the MBTA’s counselBingham, Danarepresented the MBTA as an entity, and did not individually represent Ms. Gallo. The difference between representing an organization and representing an employee of that organization, while often muddied, is sharp and distinct, and clearly defined in Rule 1.13 of the Massachusetts Rules of Professional Conduct. When an organization is an attorney’s client, then the attorney must seek to accomplish the organization’s lawful objectives, which may differ from the objectives of one or more of its employees. See Massachusetts Rule of Professional Conduct 1.13(b) and 1.2(a). If an organization’s attorney learns of conduct by an employee that violates a legal obligation to the organization, “the lawyer shall proceed as is reasonably necessary in the best interest of the organization.” Massachusetts Rule of Professional Conduct 1.13(b). When an employee is an attorney’s client, the lawyer, consistent with her obligation under the Rules, must proceed as needed in the best interest of the employee.
When an organization is an attorney’s client, the attorney may be able to confer with an organization’s employee within the umbrella of the organization’s attorney-client privilege, but that privilege belongs to the organization, not the employee. See United States v. Sawyer, 878 F.Sup. 295, 296 (D.Mass. 1995). This means that, without the employee’s consent, this conversation may be shared with others in the organization who have a need to know. Id. It also means that, without the employee’s consent, the organization may waive its attorney-client privilege and share the conversation with others outside the organization, including with law enforcement agencies. Id. In contrast, when an employee is an attorney’s client, the attorney’s conversation with the employee continues to be protected by the attorney-client privilege but that privilege belongs to the employee. As a result, the attorney may not share this information with anyone else without the consent of the employee. Id., citing In re Grand Jury Proceedings (Jackier), 434 F.Sup. 648, 650 (E.D.Mich. 1977), and In re: Standard Financial Mgmt. Corp. 77 B.R. 324, 328 (Bankr.D.Mass. 1987).
These differences are so important and yet so easily misunderstood by employees that the Rules require an organization’s attorney, when she is dealing with an organization’s employee and “it is apparent that the organization’s interests are adverse to those” of that employee, to explain the identity of her client. Massachusetts Rule of Professional Conduct 1.13(d). While it is permissible under some circumstances for the same attorney jointly to represent both an organization and an organization’s employee, just as it is *398 permissible for an attorney in other circumstances jointly to represent two clients, that joint representation may occur only with the consent of all clients if the representation of one client “may be materially limited by the lawyer’s responsibilities to another client . . Massachusetts Rule of Professional Conduct 1.13(e), 1.7.
Since Bingham Dana as of March 18, 1999 represented only the MBTA, its motion for sanctions rests on its claim that Attorney Bernstein, by interviewing Ms. Gallo, was communicating about the subject of the representation with the MBTA, whom Ms. Bernstein knew to be represented by Bingham, Dana. Comment 4.2 attempts to explain and illustrate the circumstances when speaking with an employee of an organization constitutes speaking with the organization itself. That Comment identifies three categories of employees in which speaking to them regarding the subject of the representation constitutes speaking to the organization itself:
“persons having managerial responsibility on behalf of the organization with regard to the subject of the representation,”
“any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability,” and
any other person “whose statement may constitute an admission on the part of the organization."
Massachusetts Rule of Professional Conduct 4.2, Comment 4.
Recognizing in accordance with the Scope that the Rules “are rules of reason” and “should be interpreted with reference to the purposes of legal representation and of the law itself,” this Court needs to discern the purpose of Rule 4.2 in order to interpret the Comment that seeks to explain and illustrate the meaning of Rule 4.2. See Scope 1 and 9, Massachusetts Rules of Professional Conduct. The choice of these three categories illustrate the Rule’s intended purposes.
No attorney wants her client to be discussing matters regarding legal strategy or settlement with another attorney without her being present. Nor does any attorney want her client to discuss with another attorney the merits or demerits of the client’s position without being present, since such discussions may affect the client’s resolve in prosecuting or defending the litigation or the client’s confidence in his attorney. See, e.g., Pratt v. National Railroad Passenger Corporation, 54 F.Sup.2d 78, 79 (D.Mass. 1999) (Young, J.) (“Historically, [Rule 4.2] is justified by the need to preserve the mediating role of counsel on behalf of their clients and to protect clients by overreaching by counsel for adverse interests”); Rockland Trust Company v. Computer Associates International, Inc., 1999 WL 95722 at *5 (D.Mass. 1999) (Collings.M.J.); Hanntz v. Shiley, Inc., 766 F.Sup. 258, 265 (D.N.J. 1991). In legal matters involving organizations, the organization will delegate its decision-making authority to one or more managers, and they will decide, with the advice of the organization’s attorney, whether to bring litigation, how to prosecute or defend it, and on what terms the organization will settle it. Since it is “persons having managerial responsibility on behalf of the organization with regard to the subject of the representation” who will decide these matters on behalf of the organization, Comment 4 protects an organization from having their decisions influenced by discussions with another attorney without the presence or consent of the organization’s own attorney.
Beyond these issues of strategy, settlement, and resolve, an organization’s litigation position may be substantially affected by statements made by its officers, employees, and agents that are admissible in evidence as admissions by the organization. An organization cannot prevent such admissions from being made, since all of its officers, employees, and agents maybe deposed and admissions elicited. Yet, an organization’s attorney generally will want to limit the admissions that are elicited by denying her adversary the opportunity to speak with any employee or other person whose statement may be viewed as an admission by the organization. The organization’s attorney’s reasons will be three-fold. First, the less her adversary knows about what the employee knows, the less likely her adversary will be to ask the proper question to elicit the damaging admission in a deposition. Second, the less her adversary knows about what the employee knows, the less likely her adversary will be to learn of information that may lead to other damaging evidence against the organization. Third, even if her adversary has perfect knowledge of all that occurred relevant to the litigation, her adversary will be less likely to obtain useful admissions at a deposition than at an informal interview. At a deposition, the employee has been prepared in advance and is (or should be) crafting each sentence carefully, knowing that her every word is being transcribed and may be read back to her and the jury at trial. The risk of a damaging admission being made from carelessness or imprecision is greater in the informal setting of an interview, and that risk is far greater when the interview is conducted without the employee having counsel present.
Comment 4 of Rule 4.2 protects an organization from the risk of admissions being elicited by another attorney without the organization attorney’s presence or consent by prohibiting that other attorney from speaking with any “person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability,” or “whose statement may constitute an admission on *399 the part of the organization." The scope of this prohibition is measured by the scope of the evidentiary rule admitting statements made by an organization’s employee as admissions of the organization. Pratt v. National Railroad Passenger Corporation, 54 F.Sup.2d at 79. Under Massachusetts law, that scope is substantial. In Ruszcyk v. Secretary of Public Safety, the Supreme Judicial Court rejected the common law rule regarding vicarious admissions, which limited the admission of an employee’s out-of-court statements against his employer to those where the agent had actual authority to make the proffered statement. 401 Mass. 418, 420-21 (1988). In its place, the Supreme Judicial Court adopted Proposed Mass.R.Evid. 801 (d) (2) (D), which provides, “A statement is not hearsay if . . . the statement is offered against a party and is ... a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship.” Ruszcyk v. Secretary of Public Safety, 401 Mass. at 420.
While Comment 4 of Rule 4.2, given the broad scope of this prohibition, is quite protective of organizations, it also recognizes that employees may have separate and distinct interests which may conflict with those of the organization. The last sentence of Comment 4 provides, “If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.” This means that, if an employee has retained private counsel and the attorney adverse to the organization obtains the consent of this private counsel, the employee may speak to that attorney alone, without the presence or consent of the organisation’s attorney. This discussion may indeed prove to be an unhappy one for the organizationthe employee may be told that the organization’s position is legally untenable or make admissions damaging to the organizationbut the ethical rules expressly permit it.
When one examines the first and the second sentence of Comment 4 together, and considers the practical effect of these two sentences, it becomes clear that Rule 4.2 was intended to be protective of an organization’s right to effective counsel but it is even more protective of an individual’s right to effective counsel. When these interests conflict, the former must give way to the latter. There are at least two analytical avenues to reach this conclusion.
First, it is a commonplace jury instruction that, as a general rule, one may reasonably infer that a person ordinarily intends the natural and probable consequences of any acts that he does intentionally. This guidance is as appropriate in evaluating the intent of those who draft legislation and rules as it is for discerning intent in a criminal case. If one looks at what Comment 4 does, it puts individuals first, because it permits an individual employee, with his private counsel’s consent, to speak to another attorney even when the organization’s counsel would never have permitted such a conversation.
Second, other provisions of the Massachusetts Rules of Professional Conduct recognize that an organization’s attorney may not always advise employees to refrain from giving information to another party. While such advice is permissible when the employees properly identify their interests with those of the organization, Rule 3.4(f) prohibits an organization’s attorney from requesting an employee to refrain from voluntarily giving relevant information to another party when the attorney reasonably believes that the employee’s interests will be adversely affected by doing so. Massachusetts Rule of Professional Conduct 3.4(f) and Comment 4. In other words, an organization's attorney may not even ask an employee to refrain from speaking with an adverse party, regardless of how damaging that discussion may be to the organization, if she thinks that such silence will injure the employee’s interests.[3] When an employee has private counsel, that attorney is better able than the organization’s attorney to determine whether an employee’s interests are better served by speaking with another attorney or by silence. If the employee’s private attorney determines that the employee’s best interests dictate that her client speak with another attorney, that private attorney need not obtain the blessing of the organization’s attorney before pursuing that course. If she did, the organization’s attorney, whose client may have quite different interests, may thwart the ability of private counsel effectively to represent her client. The employee’s interests may differ from those of the organization, but the employee, with the advice of his own counsel, is not barred from pursuing those interests. In short, when push comes to shove, the ethical rules favor the flesh-and-blood human being over the legal entity.
When one applies this interpretation of Rule 4.2 and Comment 4 to the case at bar, it becomes clear that Attorney Powers’ law firm represented Ms. Gallo “in the matter” of Ms. Edwards’ allegations against the MBTA of discrimination and retaliation. Litigation commenced regarding these allegations when Ms. Edwards filed her complaint with the MCAD on November 18, 1997. The MCAD litigation was pending when the MBTA conducted its internal investigation of these allegations and interviewed Ms. Gallo about them on May 18, 1998. Ms. Gallo retained Mr. Mantell to represent her for this interview. As part of his representation of her, Mr. Man-tell asked for a copy of the findings and conclusions of the internal investigation, which reasonably reflected that his client had a continuing interest in the outcome of the investigation. That interest is hardly surprising, since one of Ms. Edwards’ allega *400 tions was that the MBTA had retaliated against her for her efforts to protect Ms. Gallo against retaliation. When the internal investigator, Attorney Ebb, wished to interview Ms. Gallo as part of a continuing investigation into Ms. Gallo’s allegations (which had long been amicably resolved), Attorney Mantell, on Ms. Gallo’s behalf, informedMr. Ebb thatMs. Gallo didnot wish to attend another interview or to participate in further investigation. The filing of the civil complaint by Ms. Edwards in this Court on Januaxy 29, 1999 simply changed the forum for the litigation from the MCAD to the Superior Court; it did not transform the nature of the “matter" between Ms. Edwards and the MBTA. Nor did it functionally change Ms. Gallo’s relationship to the Edwards litigation, which by its nature put Ms. Gallo in a delicate position.
The MBTA asks this Court narrowly to define the scope of Mr. Mantell’s representation of Ms. Gallo as limited solely to the internal investigation. It is indeed true that Ms. Gallo, who was paying the Powers Law Firm on an hourly rate for the time it devoted to its representation of her in the internal investigation, was mindful of the costs of Mr. Mantell’s legal work and considered whether it was worth the money to have him perform additional legal work. After she was subpoenaed for her deposition, she decided to attend alone because she did not want to pay the legal fees required to ask Mr. Mantell or Mr. Powers to attend. The fact that a client does not ask an attorney to perform certain legal work in order to reduce costs does not necessarily mean that the attorney’s representation in that matter is over; it simply means that the client is carefully determining what work she wants the attorney to do (and she to pay for). That is why, in her deposition on June 30, 2000, Ms. Gallo, when asked whether Mr. Mantell or Mr. Powers still represented her, answered, “Only when I need them.”
As the Massachusetts Rules of Professional Conduct declare in the Preamble and Scope, the rules must be interpreted “with reference to the purposes of legal representation” and the definition of “in the matter” must be examined with that in mind. Scope 1, Massachusetts Rules of Professional Conduct. For all practical purposes, when the need arose, Ms. Gallo looked to Mr. Powers and Mr. Mantell to represent her with respect to the Edwards litigation, although for financial reasons she was sparing in her use of their time. They were the only attorneys who were obliged to advance her interests alone with respect to that litigation. Therefore, this Court finds that Mr. Powers represented Ms. Gallo “in the matter” of the Edwards litigation and Attorney Bernstein, with Mr. Powers’ consent, was permitted under Comment 4 of Rule 4.2 to interview Ms. Gallo without the presence or consent of the MBTA’s counsel.[4]
Assuming (without deciding) that this interview could only be conducted in accordance with Rule 4.2 with Mr. Powers’ consent, this Court finds that the interview violated that Rule when it took place but that this violation was cured by Mr. Powers’ subsequent consent. Since the interview could have lawfully occurred with Mr. Powers’ advance consent, there is no reason to impose sanctions when the attorney who could have given advance consent gives that consent after the fact. As Ms. Gallo’s private attorney, Mr. Powers is in the best position to determine whether Ms. Gallo’s interests were injured as a result of the interview. When he determines that there was no such injury and consents after the fact to that interview, there is no harm to Ms. Gallo that would justify sanctions by the Court. The MBTA can complain that it was harmed, but Comment 4 specifically makes Ms. Gallo’s private attorney, not her employer’s attorney, the arbiter of whether such an interview may take place.[5]
ORDER
For the reasons stated above, the defendant MBTA’s motion for sanctions is DENIED.

 It is not clear from the record whether Ropes & Gray was retained by the MBTA as outside counsel to conduct a privileged internal investigation, or whether that law firm was' retained solely as an investigator to conduct a non-privileged internal investigation. This uncertainty is of no consequence because all relevant work product from this internal investigation has been disclosed to plaintiffs counsel, so if any attorney-client privilege regarding this internal investigation ever existed, it has been waived.

 he Massachusetts Rules of Professional Conduct were adopted by the Supreme Judicial Court as Supreme Judicial Court Rule 3:07. Since it is confusing to speak of a rule within a rule, this Court, when referencing a rule, is speaking of a rule within the Massachusetts Rules of Professional Conduct.

 If the employee does not have private counsel, the organization’s attorney may insist on being present for the discussion if it is with the opposing party’s attorney, but she may not ask the employee to remain silent. If the employee has private counsel, then the organization’s attorney would have no right even to be present.

 For this reason, Bingham, Dana, prior to the December 7, 1999 deposition, should have conferred with Mr. Powers about preparing Ms. Gallo for this deposition and offering to represent her for the deposition. While it is not clear precisely what Bingham, Dana thought its relationship with Ms. Gallo was with respect to this deposition, it apparently did represent her individually and thereby entered into an attorney-client relationship with her as an individual, which is why it needed to withdraw from this attorney-client relationship once the conflict with its attorney-client relationship with the MBTA became clear.

 The MBTA argued that permitting subsequent consent means that attorneys may violate Rule 4.2 in the hope of later obtaining consent from the employee’s private attorney. This danger is minimal, since few attorneys will risk an ethical violation in the hope that they will later persuade the employee’s private attorney to consent. Indeed, given the discourtesy of not asking for consent in advance, the likelihood of obtaining consent from most private attorneys is far greater before an interview than after.